TODD W. BURNS
California State Bar No. 194937
todd@burnsandcohan.com
Burns & Cohan, Attorneys at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 236-0244
Facsimile: (619) 768-0333

Counsel for Capt. James Dolan (Ret.)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE JANIS L. SAMMARTINO)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 17-cr-0623-JLS |
| Plaintiff, ) | |
| ) | JAMES DOLAN'S |
| vs. ) | SUPPLEMENTAL MEMO |
| ) | REGARDING PRE-TRIAL |
| JAMES DOLAN (4), ) | MOTIONS TO DISMISS, |
| ) | SPECIFICALLY WITH RESPECT |
| Defendant. ) | TO GOVERNMENT'S USE OF |
| ) | "STREAM OF BENEFITS" |
| ) | THEORY IN INDICTMENT |
| ) | |
| ) | Date:    March 19, 2021 |
| ) | Time:   11:00 a.m. |
| _____ ) | |

**INTRODUCTION**

In their pre-trial motions, the Defendants challenged the validity of the "stream of benefits" bribery theory – on which the indictment relies for all three charges against Capt. Dolan – by arguing that it was undermined by *McDonnell v. United States*, 136 S. Ct. 2355 (2016). In arguing that theory is still valid, the government relied in large part on the Second Circuit's opinion in *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), and two cases from the Southern District of New York. *See* 2/15/19 Gov't Memo. at 11 & n.3 (Docket #237). One of those district court cases was appealed, and in *United States v. Silver*, 943 F.3d 538 (2d Cir. 2020), the Second Circuit narrowed *Ganim*'s holding and in doing so, made clear that the theory charged

in the indictment in this case is contrary to *McDonnell*.  Accordingly, Capt. Dolan again moves to dismiss the three counts in which he is named.

Capt. Dolan is submitting this supplemental memorandum at this time because *Silver* was filed nearly a year after the Court denied the previously-filed motions to dismiss, and because *Silver* provides an extensive and well-reasoned discussion of the impact of *McDonnell* on the "stream of benefits" bribery theory.

Below, Capt. Dolan summarizes the prior litigation in this case with respect to that issue, then discusses *McDonnell* and *Silver*, and finally applies that case law to the indictment in this case.

## RELEVANT BACKGROUND

A central complaint in the Defendants' previously-filed motions was that the indictment doesn't charge a clear *quid pro quo* bribery agreement against which they can prepare to defend at trial, and, relatedly, the indictment doesn't perform the essential function of limiting the government's trial case.  That deficiency is rooted in large part in the indictment's use of the "stream of benefits" theory.  *See, e.g.*, 1/14/19 Dolan Memo. at 34-35 (Docket #204).  In their pretrial motions, the Defendants argued that the stream of benefits theory didn't survive the Supreme Court's opinion in *McDonnell*.  *See id.*; *see also* 3/1/19 Newland Memo. at 3 (Docket #243).

In its response memorandum, the government claimed that its reliance on the "stream of benefits" theory absolved it of the need to charge an explicit bribery transaction or agreement.  *See* 2/15/19 Gov't Memo. at 10 (Docket #237).  The government also said that theory was validated in the Second Circuit's *Ganim* opinion and the Ninth Circuit's opinion in *United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009), and that two "[d]istrict courts in the Second Circuit have made clear that the Supreme Court's decision in *McDonnell* leaves this body of law unchanged." 2/15/19 Gov't Memo. at 11 & n.3 (Docket #237).

//

2

At the subsequent motions hearing, government counsel made additional, relevant statements on this subject.

First, government counsel reiterated that the "indictment was brought" "under" a "course of conduct theory," which, he said, is also referred to as a "stream of benefits" or "as opportunities arise" theory.[1]  3/21/19 RT at 124 (Docket #262).

Second, government counsel cited the case law relied on in the government's response memorandum and stated that "[n]o court has said that *McDonnell* changes the viability of [the stream of benefits] theory." *Id.* at 124-25.  Then he said:

> Now, the relevance of this theory is that at the time something is received [by a bribee] *there's not a specific overt act that in that moment, the moment of receiving the thing of value, can be identified as being the thing that the person is going to act on.*
>
> * * *
>
> So the fact that the things received [*i.e.*, the official acts done] are not alleged with the same precision and particularity as the things given [to the bribee] is not a function of our failure to be specific but a function of the conspiracy itself as it's been charged.

*Id.* at 125-26 (emphasis added).

A few minutes later, Capt. Dolan's counsel addressed the remarks of government counsel with respect to the "stream of benefits" theory.  After summarizing the facts and holding of *McDonnell*, he turned to this case:

> [T]he stream of benefits theory is problematic if there is no substance attached to whatever the official act agreement is in the first place.  It would have to be something of the nature of, "I'll give you this watch." "Okay, well, I'll help you jam a contract through a government commission or pass some legislation, something that qualifies as an official act.  *There has to be some substance to [the official act agreed to be performed].  It can't just be vaguely, "I'll help you in the future."*

---

[1]  The "as opportunities arise" label is more apt here because the problem is with the indictment's failure to allege the particular question(s) or matter(s) on which Defendants agreed to act when the *quid pro quo* agreement was formed, not with the "stream of benefits" allegedly promised by Mr. Francis at that time.  Regardless, the phrases are used interchangeably herein.

3

3/21/19 RT at 130 (emphasis added) (Docket #262).  These remarks foreshadowed the Second Circuit's opinion in *Silver*.

### THE SUPREME COURT'S *McDONNELL* OPINION, AND THE SECOND CIRCUIT'S *SILVER* OPINION

To better track the Second Circuit's *Silver* opinion, it is useful to first discuss the Supreme Court's *McDonnell* opinion.

## I.    *McDonnell v. United States*

To establish bribery under 18 U.S.C. §201(b)(2)(A) – which is central to all the charges against Capt. Dolan – the government must show a public official agreed to accept something of value in exchange for "being influenced in the performance of any official act."   In *McDonnell*, the Supreme Court addressed "the proper interpretation of the term 'official act,'" 136 S. Ct. at 2367, which is defined in §201(a)(3) as:

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

Before turning to the Court's explication of this definition, it is helpful to consider the background facts in that case.

In *McDonnell*, former Virginia Governor Robert McDonnell and his wife were indicted for bribery based on their accepting $175,000 in loans, gifts, and other benefits from "the CEO of Star Scientific, a Virginia-based company that developed and marketed Anatabloc, a nutritional supplement made from anatabine, a compound found in tobacco." *Id*. at 2361-62.  At trial the government alleged that in exchange for those benefits, McDonnell committed at least five "official acts" for Star Scientific and its CEO:

> (1)    he arranged meetings between Star Scientific's CEO and Virginia government officials to discuss and promote Star Scientific's interests;

//

(2)     he hosted and attended events at the Governor's Mansion designed to encourage Virginia university researchers to study and promote Star Scientific's products;

(3)     he contacted government officials to encourage Virginia state research universities to initiate studies favorable to Star Scientific;

(4)     he promoted Star Scientific by allowing its CEO to invite people to exclusive events at the Governor's Mansion; and

(5)     he recommended that senior government officials in the Governor's office meet with executives from Star Scientific.

*Id.* at 2365–66. At the government's behest, the district court in *McDonnell* gave the jury a broad definition of "official acts," stating that they are acts "a public official customarily performs," including acts "that have been clearly established by settled practice as part of a public official's position," and acts that further long term goals or contribute to "a series of steps to exercise influence or achieve an end." *Id.* at 2366, 2373. So charged, the jury convicted McDonnell of honest-services fraud, based on a bribery theory, and the Fourth Circuit affirmed.[2] The Supreme Court vacated that conviction because the instructions incorrectly described "official acts." *Id.* at 2375.

Explaining why, the Court began by observing that the words "cause, suit, proceeding or controversy" in §201(a)(3)'s definition of official act "connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* at 2368. The Court then applied the interpretive canon *noscitur a sociis* ("a word is known by the company it keeps") and concluded the other two terms found in the definition of "official act" – "question" or "matter" – must "be similar in nature to a cause, suit, proceeding or controversy." *Id.* at 2368-69 (citation and internal quotation marks omitted). Furthermore, limiting the meaning of

---

[2] Although *McDonnell* involved an honest services bribery charge, the parties agreed that the definition of bribery in §201 controlled. *See McDonnell*, 136 S. Ct. at 2365.

1   "question" or "matter" makes sense because otherwise "the terms 'cause, suit,
2   proceeding or controversy' would serve no role in the statute – every 'cause, suit,
3   proceeding or controversy' would also be a 'question' or 'matter.'" *Id*. at 2369. The
4   Court also cautioned against considering a question, matter, cause, suit, proceeding
5   or controversy at too high a level of generality. Instead, any qualifying question,
6   matter, cause, suit, proceeding, or controversy must be "focused and concrete." *Id*.

7       The opinion continued to further limit the meaning of "question, matter, cause,
8   suit, proceeding or controversy" based on the surrounding statutory text. Specifically,
9   the Court held that the words "pending" and "may by law be brought" "suggest
10  something that is relatively circumscribed – the kind of thing that can be put on an
11  agenda, tracked for progress, and then checked off as complete." *Id*. Furthermore,
12  the phrase "may by law be brought" indicates "something within the specific duties
13  of an official's position." *Id*. On the other hand, the word "any" indicates that "the
14  matter may be pending either before the public official who is performing the official
15  act, or before another public official." *Id*.

16      Putting all this together, the Court summarized its holding by stating that a
17  "question, matter, cause, suit, proceeding or controversy" denotes a formal
18  government action analogous to a lawsuit, hearing, or administrative determination
19  that can be pending before any public official. It must be specific and concrete, fall
20  within the duties of an official's position, and be relatively circumscribed, something
21  capable of being put on an agenda, tracked for progress, and checked off as complete.

22      The Court then applied this definition to the facts in *McDonnell*. "The first
23  inquiry," the Court said, is whether any of Governor McDonnell's activities –
24  meetings, calls, and events – qualified as a "question, matter, cause, suit, proceeding
25  or controversy." *Id*. at 2368. Concluding that the answer was no, the Court moved
26  on to the next inquiry: whether any meeting, call, or event engaged in by Governor
27  McDonnell could "qualify as a 'decision or action' on a different question or matter."
28  *Id*. at 2369. Answering that question required the Court to identify the different

questions or matters on which Governor McDonnell allegedly acted. *See id*. The Court began, however, by making clear that something like "Virginia business and economic development" could not constitute an underlying matter because it is defined at too high a level of generality and is not something that could be "pending" before a public official, as the Court construed "pending." *Id*. The Court then turned to the Fourth Circuit's formulation of the underlying questions in *McDonnell*, specifically:

> (1)  "whether researchers at any of Virginia's state universities would initiate a study of Anatabloc;"
>
> (2)  "whether the state-created Tobacco Indemnification and Community Revitalization Commission would allocate grant money for the study of anatabine;" and
>
> (3)  "whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug."

*Id*. at 2369-70 (citation and internal quotation marks omitted). The Court concluded that each of those questions "is focused and concrete, and each involves a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination, or hearing." *Id*. at 2370. Still, merely setting up a meeting, hosting an event, or calling another official – while actions related to those questions – ultimately could not qualify as actions or decisions on those questions. Something more was needed, such as a decision to actually initiate a research study or to provide advice to another official with the intent to cause the other official to perform an official act. *See id.*

With that in mind, the Court turned to the jury instructions given in *McDonnell* and concluded they were "significantly overinclusive." *Id.* at 2373-75. In particular, the district court erred when it instructed the jury that an "official act" includes "actions that have been clearly established by settled practice as part of a public official's position," and could include acts designed to contribute to a long-term result. *Id.* at 2373. The Court held that description did not inform the jury that an official act must be on a "question, matter, cause, suit, proceeding or controversy,"

1   nor did it explain how to identify the same.  *Id.* at 2374.  Thus, while the Fourth
2   Circuit had noted possible questions on which McDonnell had perhaps acted, nothing
3   guaranteed that the jury found McDonnell acted on those questions when it voted to
4   convict.  That is, the jury might have "convicted Governor McDonnell without
5   finding that he agreed to make a decision or take an action on a properly defined
6   question, matter, cause, suit, proceeding or controversy."  *Id.* at 2374-75 (internal
7   quotation marks omitted).  Thus, the instructions could not be considered harmless.
8   *Id.* at 2375.

9       As this discussion shows, unwinding *McDonnell*, and thus accurately
10  understanding the reach of "official act," is complicated.  For example, the Third
11  Circuit has crafted a three-part test in this regard, and each step is less-than-
12  straightforward.  *See United States v. Fattah*, 914 F.3d 112, 152-54 (3d Cir. 2019).
13  Given this, it is ironic that part of what drove the opinion and outcome in *McDonnell*
14  was a concern with vagueness, specifically that "under the Government's
15  interpretation, the term 'official act' is not defined 'with sufficient definiteness that
16  ordinary people can understand what conduct is prohibited,' or 'in a manner that does
17  not encourage arbitrary and discriminatory enforcement.'"  136 S. Ct. at 2373
18  (quoting *Skilling*, 561 U.S., at 402-03 (internal quotation marks omitted)).  It is
19  difficult to imagine how an "ordinary person" can grasp the reach of "official act,"
20  when it takes the Supreme Court and the circuit courts pages of analysis to define the
21  term, and the result is that the term is still largely opaque.  That supports the previous
22  vagueness motions filed by the Defendants.  *See, e.g.*, 1/14/19 Dolan Memo. at 28-35
23  (Docket #204); *cf. United States v. Johnson*, 598-603 (holding definition of "violent
24  felony" was void-for-vagueness due to difficulty courts ran into when applying the
25  Supreme Court's multi-part test, and rejecting "theory that a vague provision is
26  constitutional merely because there is some conduct that clearly falls within the
27  provision's grasp").

28  //

But that is not the purpose of this memorandum – the purpose is to address the "stream of benefits"/"as opportunities arise" theory of bribery charged.  To that end, Capt. Dolan now turns to discussing the Second Circuit's opinion in *Silver*.

## II.   *United States v. Silver*

In *Silver*, the defendant "argue[d] that the 'as the opportunities arise' theory of bribery recognized in *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007), does not survive *McDonnell*, which, he claim[ed], requires identification of the particular act to be performed at the time the official accepts a payment or makes a promise." *Silver*, 948 F.3d at 545.

The Second Circuit began its analysis of this argument by stating, "Silver is incorrect in asserting that bribery requires a promise to perform a particular official act," because to be guilty of bribery it is not necessary that an official "specify the *means* that he will use to perform his end of the bargain."  *Id.* at 553 (quoting *McDonnell*, 136 S. Ct. at 2371).  But, the court continued, "[a]lthough we disagree that *McDonnell* requires identification of a particular act of influence, we do agree that it requires identification of a particular question or matter to be influenced.  In other words, a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises."  *Silver*, 948 F.3d at 552-53; *see also id.* at 545 ("the government must show that the official understood – at the time he accepted payment – the particular *question or matter* to be influenced").

This holding, the Second Circuit explained, was driven by "*McDonnell's* interpretation of the 'official act' requirement" in §201, which "provides a narrowing gloss on" the 'as the opportunities arose' theory" approved in *Ganim.  See Silver*, 948 F.3d at 558.  Specifically, the court said:

> *McDonnell* suggests that, at the time the bribe is made, the promised official act must relate to a "properly defined" "question, matter, cause, suit, proceeding or controversy."  *See McDonnell*, 136 S. Ct. at 2374.

This follows from the fact that there are two requirements for an official act:  "First, the Government must identify a 'question, matter, cause, suit, proceeding or controversy,'" and "[s]econd, the Government must prove that the public official made a decision or took an action *'on' that* question, matter, cause, suit, proceeding, or controversy, or agreed to do so." Id. at 2368 (emphasis added). Thus, for an official to promise to perform an official act – and thereby engage in the prohibited *quid pro quo* – the official must promise to act *on* an identified "question, matter, cause, suit proceeding, or controversy" at the time of the promise. *See id.*

*Silver*, 948 F.3d at 556. The Second Circuit gave an example to illustrate this point, in which it also emphasized the focused, concrete, and specific aspect of *McDonnell*'s holding:

An official accepts a bribe, stating to the payor that she will "take official acts as the opportunities arise." In other words, the official has promised to take – as the opportunities arise – "any decision or action on any question, matter, cause, suit, proceeding or controversy [that] may at any time be pending," 18 U.S.C. § 201(a)(3) (emphasis added), a promise so vague as to be meaningless. The official has not agreed to take official action on a properly defined – *i.e.*, focused, concrete and specific – question or matter. The official has failed to offer a quo. Absent any additional specificity, criminal liability could attach to any later action the official takes so long as the official is exercising some ability granted to him or her by law, regardless of the fact that the official essentially promised nothing in return for the payment.

*Silver*, 948 F.3d at 556-57.

In addition to providing a "narrowing gloss" on *Ganim* based on *McDonnell*, the Second Circuit discussed how other circuit courts had approached the issue before *McDonnell*, essentially spreading its "gloss" around. Specifically, the Second Circuit stated:

To the extent our sister circuits have used language suggesting the open-ended liability advanced by the Government, a close review of the facts in each case makes clear that they, like *Ganim*, do not support such a sweeping view of bribery. For example, in *United States v. Kincaid-Chauncey*, the Ninth Circuit upheld instructions regarding extortion and honest services fraud similar to those in *Ganim* – that the public official must have "underst[ood] that he or she [was] expected as a result of the payment to exercise particular kinds of influence as specific opportunities ar[o]se." 556 F.3d at 945.

*Silver*, 948 F.3d at 566. In *Kinkaid-Chauncey*, the Second Circuit explained, the defendant was alleged to have received payments for things that were obviously

10

formal government acts, specifically helping a club owner with "certain ordinances, permits, and licenses . . . ." *Id.* at 566.  The Second Circuit went on:

> The Ninth Circuit's observation [in *Kinkaid-Chauncey*] that "[i]t is sufficient . . . if the evidence establishes that the government official . . . has received payments or other items of value with the understanding that when the payor comes calling, the government official will do whatever is asked" was set in the context of identified concerns followed by official acts. [*Kinkaid-Chauncey*, 566 F.3d at 927-28, 943 n.15]. As in *Ganim*, the commissioner [defendant in *Kinkaid-Chauncey*] knew she was expected to assist in securing various government approvals for the owner's business in exchange for the payments.  What she, like *Ganim*, did not know was what form that assistance would ultimately take.  The phrase "when the payor comes calling" was thus another way of conveying that the specific act need not be identified at the time of payment, but may instead be later identified, by the payor, when a specific opportunity arises.  The phrase does not, in light of its factual context, suggest that an official may be held criminally liable for accepting a payment with the understanding that she will take some action on any conceivable topic.

*Silver*, 948 F.3d at 566.  As the Second Circuit noted disapprovingly, the latter reading would "create[] a situation where an official could accept a payment – lawful or otherwise – and later incur criminal liability by voting on any legislation or performing any official act on any topic that benefits the payor."  *Id.* at 568-569.

The court concluded *Silver* by holding that "the district court's instructions were erroneous" because "[t]hey only required the jury to find that Silver understood, at the time that he accepted any *quid*, that he was expected to exercise official influence or take official action for the benefit of the payor."  *Id.* at 559.  Those "instructions were erroneous because the required *quid pro quo* contained therein was too open-ended.  The instructions failed to convey that Silver could not be convicted . . . unless the Government proved that, at the time the bribe was accepted, Silver promised to take official action on a specific and focused question or matter as the opportunities to take such action arose."  *Id.* at 569.

Although the Ninth Circuit has not addressed the viability of the "stream of benefits" theory since *McDonnell*, its opinion in *United States v. Kimbrew*, 944 F.3d 810, 815 (9th Cir. 2019), is consistent with *Silver* and the Second Circuit's take on *Kinkaid-Chauncey*.  Specifically, in *Kimbrew* the Ninth Circuit said:

11

The statutory definition of "official act" contains broad temporal language that indicates the question or matter at issue need not currently be pending or capable of being brought before a public official. *See* 18 U.S.C. § 201(a)(3) (referring to questions or matters "which *may at any time* be pending, or which may by law *be brought* before any public official") (emphases added). This language encompasses scenarios in which a briber might anticipatorily seek to induce official action relevant to a circumstance yet-to-come. For example, on the eve of anticipated marijuana legalization – but while its sale was still illegal – an entrepreneur might bribe an official to *"reserve" his services to help obtain a future dispensary permit. A quid pro quo of that nature remains a private inducement attached to the provision of a "formal exercise of government power," see McDonnell*, 136 S. Ct. at 2369-70, albeit a contingent one. But a bribe tied to a contingency is no less a bribe.

Kimbrew's *permit-related promise* fits that mold. Kimbrew represented that, in the near future, the City of Compton would permit a small number of dispensaries to operate. In response, the UC sought to make "arrangements" for Green Legendz to be one of those dispensaries. Against that backdrop, the absence of a permitting architecture at the moment of agreement is not dispositive. It is true that the contingency never came to be, and Green Legendz got shut down, but §201 liability does not depend on an outcome; the offense is complete at the moment of agreement, and that agreement need not even be accompanied by the bribe recipient's genuine intentions to follow through.

*Kimbrew*, 944 F.3d 810, 815 (9th Cir. 2019) (emphasis added). Thus, in *Kimbrew* the promise to do something in the future – or as opportunities arose – was specific and focused, that being to obtain a dispensary permit for the bribe-payer. That is consistent with *Silver* and *McDonnell*. Furthermore, and also consistent with *Silver*, *Kimbrew* re-enforces that the relevant time period for the offense is when the alleged *quid pro quo* agreement is made, not what comes later.

Thus, it is essential that the government charge, and prove, that the alleged agreement was unlawful when made. Here, that requires a charge that when the alleged agreement was entered into, Capt. Dolan "promise[d] to take official action *on a particular question or matter . . . ."* *Silver*, 948 F.3d at 552-53. Capt. Dolan now turns to addressing the indictment's failure to make any such allegation.

//

//

//

12

1

2

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT FAILS TO ADEQUATELY CHARGE A "STREAM OF BENEFITS," OR "AS OPPORTUNITIES ARISE," THEORY**

3

## I.    Introduction

4

As government counsel acknowledged during the March 21, 2019, motions

5

hearing, the indictment relies on a "stream of benefits" theory without alleging "the

6

thing that the [Defendants were] going to act on" in exchange for the benefits.

7

3/21/19 RT at 125 (Docket #262).  The indictment bears out that admission.  Thus,

8

under *McDonnell* and *Silver*, it does not validly charge the bribery offenses.

9

Below, Capt. Dolan addresses this issue with respect to the three indictment

10

counts in which he is named (1, 5, and 13).

11

## II.   Count 1 – Bribery Conspiracy

12

The core allegation for the count 1 bribery conspiracy is in paragraph 32 of the

13

indictment, which states:

14

15

16

17

18

19

20

21

22

23

> Beginning in or about February 2006 on the high seas and outside the jurisdiction of any particular district, and continuing through at least February 2014, [Capt. Dolan and the other eight] defendants [charged] . . . did knowingly and intentionally conspire and agree with each other and with others . . . to commit an offense against the United States, namely bribery; that is, (1) the defendants and others knowingly agreed that, in return for the defendants being influenced in the performance of official acts and being induced to do and omit to do acts in violation of their official duties, and aiding and abetting other defendants to be so influenced and induced, (a) Francis and others would directly and indirectly, corruptly give, offer, and promise things of value to the defendants, collectively and individually, including meals, entertainment, travel and hotel expenses, gifts, cash, and the services of prostitutes, and (b) the defendants, collectively and individually, would directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept these things of value personally and for other persons; and (2) the defendants and others took overt acts in furtherance of this conspiracy, in violation of Title 18, United States Code, Section 201(b)(2)(A) and (C), and Title 18, United States Code, Section 2.

24

Indictment at ¶32 (Docket #1).  As for the "objects of the conspiracy" with respect

25

to the "official acts" stream of benefits theory, count 1 alleges:

26

27

28

> It was an object of the conspiracy for the defendants to use their official positions and individual and combined influence in the U.S. Navy to perform official acts; to exert pressure on other officials to perform official acts; and to advocate before and advise other officials, knowing and intending that such advocacy and advice would form the basis for

13

their official acts; *all to advance GDMA's interests, as questions, matters, and controversies regarding GDMA's ship husbanding business were brought to the defendants' attention*.  In return, Francis and others would offer and give a stream of benefits to or on behalf of the defendants, including, among other things of value, meals, entertainment, travel and hotel expenses, gifts, cash, and the services of prostitutes.

Indictment at ¶33 (Docket #1) (emphasis added).  Finally, the "manner and means" section of count 1 states, in relevant part:

In return for this stream of benefits from Francis [mentioned in the three preceding sub-paragraphs], defendants agreed to perform official acts; to exert pressure on other officials to perform official acts; and to advocate before and advise other officials, knowing and intending that such advocacy and advice would form the basis for their official acts; *all to advance GDMA's interests as questions, matters, and controversies regarding its ship husbanding business were brought to defendants' attention*.

Indictment at ¶35(d) (Docket #1).

None of this language adequately charges a "stream of benefits" bribery conspiracy, because it only alleges that the Defendants agreed to act generally "to advance GDMA's interests, as questions, matters, and controversies regarding GDMA's ship husbanding business were brought to the defendants' attention."  As addressed above, to validly proceed on such a theory the indictment must allege, and the government must show, "a public official [did] more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." *Silver*, 948 F.3d at 552-53.  The charging language quoted above doesn't identify any such "particular question or matter."  Nor does count 1 make such an allegation elsewhere.

The government may argue that count 1 is nonetheless adequate because it alleges things the Defendant later did for Francis, after the agreement was formed. For example, the "manners and means" section of count 1 lists several things about which, or which, the Defendants subsequently "informed," "provided," "took," "authored," "signed, and "arranged."     Indictment at ¶35(e)-(j) (Docket #1).

14

Furthermore, the overt acts section allege things the Defendants did. *See id.* at ¶36. But, as the government has acknowledged, the key point with respect to the conspiracy offenses charged is the point at which the unlawful agreement was formed. *See, e.g.*, 2/15/19 Gov't Memo. at 9 ("the requirement of a 'quid pro quo' is satisfied where the public official, in return for the thing of value, explicitly or implicitly agrees to perform or influence the official act or violate the official duty – regardless of when, how, or whether the public official ultimately carries out this agreement, or even intends to carry it out") (Docket #237); *see also Kimbrew*, 944 F.3d at 815 ("the offense of bribery is complete upon the agreement between the briber and the public official"). It is, therefore, essential that the indictment charge (and the government prove) that the agreement itself was unlawful, and here that means charging that the official "promise[d] to take official action *on a particular question or matter* as the opportunity to influence that same question or matter ar[ose]." That requirement is not just compelled by the statutory definition of "official act," it is critical to preventing prosecutorial overreach. *See Silver*, 948 F.3d at 568-69 (stating that failure to require the government to show the specific *quo* promised at the time the agreement was formed would create an intolerable "situation where an official could accept a payment – lawful or otherwise – and later incur criminal liability by voting on any legislation or performing any official act on any topic that benefits the payor"); *McDonnell*, 136 S. Ct. at 2372-73 (recognizing same and stating that its holding is intended "to protect against overzealous prosecutions under §201").

A final point bears making, though it is not determinative of this motion to dismiss. Many of the things alleged in the "manners and means" and "overt acts" sections of count 1 do not, themselves, qualify as "official acts" – indeed, many amount to, or are analogous to, having a meeting, making a telephone call, or attending an event. Nor is it evident how the vast majority of the non-official acts alleged in the indictment "qualify as a 'decision or action' on a different question or

1  matter." *Id.* at 2369.  The overt acts section is rife with such examples, but so, too,

2  is the "manners and means" section, which contains more distilled allegations.  For

3  example, that section charges that the Defendants "authored and signed and arranged

4  for other U.S. Navy officers to author and sign letters and communications praising

5  GDMA's performance of husbanding services."  Indictment at ¶35(i) (Docket #1).

6  It is hard to see how that qualifies as an official act, directly or indirectly, and it seems

7  tied to nothing so much as the vague (*i.e.*, not specific and focused) allegation, also

8  found in the "manners and means" section, that "Defendants took official acts . . . [to]

9  resolve in GDMA's favor other questions, matters, and controversies regarding

10  GDMA's husbanding business."  *Id.* at ¶35(j).

11      The same problem is evident with respect to the most salacious allegation in

12  the government's case, specifically that some of the Defendants "provid[ed] Francis

13  with classified U.S. Navy ship schedules and narrative summaries of those

14  schedules," and "provid[ed] Francis with internal, proprietary U.S. Navy

15  information."  *Id.* at ¶35(e)-(f).  Those allegations, however troubling, don't amount

16  to official acts under *McDonnell*.  That is driven home by the Eleventh Circuit's

17  holding that an official's revealing the identity of an undercover police officer did not

18  itself amount to an "official act."  *See United States v. Van Buren*, 940 F.3d 1192 (11th

19  Cir. 2019).  As that court explained, the "government's incorrect formulation of the

20  'question' or 'matter' [on that issue] threaten[ed] to transform any improper

21  disclosure by a public official into an 'official act' under the bribery statute,

22  regardless of whether the disclosure was meant to influence a formal exercise of

23  governmental power that is analogous to a lawsuit, hearing, or administrative

24  determination."  *Id.* at 1204.

25      All of this leads to a glaring practical problem, were the government to argue,

26  and the Court accept, that the indictment need not charge the "as opportunities arise"

27  *quid pro quo* theory correctly, because it alleges that the Defendants subsequently did

28  things for Mr. Francis.  As discussed, most of the charged, post-agreement conduct

does not itself amount to an "official act," directly or indirectly, but it is nonetheless highly likely the grand jury relied on that same conduct when deciding to indict. That is, the grand jury likely relied on lawful post-agreement conduct to indict on an insufficient allegation of a "stream of benefits" agreement.

It bears reiterating, however, that the charging of the post-agreement conduct is irrelevant to the outcome of Mr. Dolan's motions to dismiss in this context. Instead, because count 1 fails to adequately charge a criminal agreement under the "as opportunities arise" theory, it should be dismissed.

## III.   Count 13 – Honest Services Fraud Bribery Conspiracy

The points made above apply with equal force to the honest services bribery conspiracy charged in count 13, because that barebones charge is based on incorporating the "objects of the conspiracy," "manner and means," and "overt acts" paragraphs charged in count 1. *See* Indictment at ¶60 (Docket #1). And, notably, the government has routinely asserted, and courts have regularly accepted, that honest services bribery is founded on §201's definition of bribery. *See, e.g., McDonnell*, 136 S. Ct. at 2365 ("[t]he parties agreed that they would define honest services fraud [for the jury] with reference to the federal bribery statute, 18 U.S.C. §201"). Accordingly, for the reasons given with respect to count 1, count 13 should also be dismissed.

## IV.   Count 5 – Substantive Bribery Charge Naming Capt. Dolan

Count 5 charges Capt. Dolan with a substantive bribery offense under §201, and requires a slightly different analysis.

Unlike counts 1 and 13, count 5 doesn't incorporate the "objects of the conspiracy" and "manners and means" sections of count 1, though it does incorporate the overt acts. *See* Indictment at ¶43 (Docket #1). Count 5 then states:

> Beginning in or about January 2008 on the high seas and out of the jurisdiction of any particular district and continuing through at least in or about September 2013, defendant James Dolan, aka "JD," a public official, engaged in a course of conduct whereby he directly and indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept things of value, personally and for other persons, including entertainment, hotel stays, and the services of prostitutes, in

17

1  return for being influenced *in the performance of official acts* and in
2  return for being induced to do and omit to do acts in violation of his
   official duties, *as opportunities arose*. All in violation of Title 18,
3  United States Code, Section 201(b)(2)(A) and (C).

4  Indictment at ¶44 (Docket #1) (emphasis added).  As indicated by the emphasized

5  language, the "as opportunities arose" theory is charged in count 5.  And that charge

6  suffers the same defect as count 1, because it does not identify a particular question

7  or matter on which Capt. Dolan agreed to act as opportunities arose. *See Silver*, 948

8  F.3d at 552-53.

9      There is an additional problem with count 5 that bears mentioning, which ties

10  into another of Capt. Dolan's previously-filed pre-trial motions.

11      In *Silver*, the Second Circuit stated, "*McDonnell* re-emphasizes that the

12  relevant point in time in a *quid pro quo* bribery scheme is the moment at which the

13  public official accepts the payment. *See id.* at 2374; *see also Evans*, 504 U.S. at 268

14  ('[T]he offense is completed at the time when the public official receives a payment

15  in return for his agreement to perform specific official acts')." *Silver*, 948 F.3d at

16  556.  The quoted/cited language from *Silver*, *Evans*, and *McDonnell* makes clear that

17  a substantive bribery offense is not a continuing offense, instead it "is completed at

18  the time when the public official receives a payment in return for his agreement to

19  perform specific official acts."[3]  *Evans*, 504 U.S. at 268.  In light of this, the

20  government's charging count 5 as a continuing offense is impermissible.  That issue

21  was raised in Capt. Dolan's initial motions to dismiss, but is being re-raised here in

22  light of the clear Supreme Court authority supporting the point. *See* 1/14/19 Dolan

23  Memo. at 37-40 (Docket #204).

24  _____

25      [3]  Incidentally, it is not clear how the quoted language squares with the oft-

26  stated assertion that "the offense of bribery is complete upon the agreement between
   the briber and the public official. *McDonnell*, 136 S. Ct. at 2370-71." *Kimbrew*, 944

27  F.3d at 815.  But for present purposes, that is irrelevant, because the point here is that

28  bribery is not a continuing offense.

## V.    Conclusion

A final point bears making.  The discussion above focuses on the "official acts" aspect of the government's case under §201(b)(2)(A), not the "official duties" aspect under §201(b)(2)(C).  *See, e.g.*, 1/14/19 Dolan Memo. at 2-4 (Docket #204) (discussing the two forms of bribery charged in the indictment).  The remedy is nonetheless dismissal of all three counts discussed, for three independent reasons.

First, the indictment's deficiencies with respect to the "official acts" allegations are so pervasive that it is impossible to dismiss solely those aspects of the indictment and leave the official duties allegations intact.

Second, and relatedly, only two indictment paragraphs alleged that Capt. Dolan undertook any "official act," and nowhere in the indictment is it alleged that Capt. Dolan did anything, or omitted to do anything, in violation of his "official duties." *See* Indictment at ¶¶36(A99) and (A166) (alleging Capt. Dolan engaged in "official acts").

Finally, *McDonnell* should be applied to narrow the meaning of "official duties" commensurate with the definition of "official acts," based on the canon of *noscitur a sociis* ("a word is known by the company it keeps") and because to do otherwise would lead to absurd results.  Given that, the indictment is deficient under *Silver* and *McDonnell* because it relies on the "as opportunities arose" theory with respect the "official duties" aspect of the case, but fails to identify the specific official duties that the Defendants agreed to undertake, or omit to fulfill, at the time the alleged *quid pro quo* agreement was made. *See* Indictment at ¶¶32, 34, 35(k)-(m), 44, 60-61.

## CONCLUSION

For the foregoing reasons, Capt. Dolan requests that the Court dismiss him from all three counts of the indictment in which he is named.  In any event, Capt. Dolan requests that the Court order the government to produce in discovery the portions of the grand jury transcript and materials in which the grand jurors were

instructed on the law and charges. *See* Fed. R. Crim. P. 6(e)(3)(E)(ii) (stating that a court may order disclosure "of grand jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury").

Respectfully submitted,

Date:  February 19, 2021          */s/ Todd W. Burns*
                                  Counsel for Capt. James Dolan (Ret.)

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that the foregoing pleading is true and accurate to the best of information and belief, and that a copy of the foregoing document has been caused to be delivered this day upon counsel for all parties via CM/ECF.

Date:  February 19, 2021

*/s/ Todd W. Burns*
Burns & Cohan, Attorneys at Law
1350 Columbia St., Suite 600
San Diego, California, 92101
Phone:  619-236-0344
Fax:  619-768-0333
Email: todd@burnsandcohan.com