TODD W. BURNS
California State Bar No. 194937
todd@burnsandcohan.com
Burns & Cohan, Attorneys at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 236-0244
Facsimile: (619) 768-0333

Counsel for James Dolan

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE JANIS L. SAMMARTINO)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-cr-0623-JLS |
| Plaintiff, | |
| vs. | |
| JAMES DOLAN (4), | Date: September 2, 2021 |
| Defendant. | Time: 9:00 a.m. |

JAMES DOLAN'S NOTICE OF MOTIONS *IN LIMINE* AND MOTIONS *IN LIMINE* TO: (1) ALLOW THE VIDEO-RECORDED DEPOSITION OF MORENA DE JESUS; (2) PRECLUDE MR. FRANCIS'S TESTIMONY REGARDING MR. DOLAN'S JOB RESPONSIBILITIES AND MOTIVES; (3) PRECLUDE EVIDENCE UNRELATED TO AN "OFFICIAL ACT" OR "OFFICIAL DUTY;" (4) COMPEL DISCOVERY ABOUT "COOPERATORS;" (5) ALLOW DEFENSE COUNSEL TO ASK LEADING QUESTIONS ON DIRECT EXAMINATION OF GOVERNMENT AGENTS, AND PRECLUDE LEADING QUESTIONS DURING "CROSS;" (6) PRECLUDE EVIDENCE OF HEARSAY STATEMENTS BY "COOPERATORS;" AND

(7) ALLOW DEFENSE COUNSEL TO ELICIT EVIDENCE OF WITNESSES'
PRIOR INCONSISTENT STATEMENTS THROUGH THE CASE AGENT;
(8) EXCLUDE EVIDENCE REGARDING PROSTITUTION; (9) PRECLUDE
COOPERATORS' TESTIMONY THAT THEY ARE OBLIGATED TO
"TELL THE TRUTH;" AND (10) SEVER OR PRECLUDE
EVIDENCE THAT VIOLATES *BRUTON*

# TABLE OF CONTENTS

*Page*

NOTICE OF MOTIONS *IN LIMINE* AND MOTIONS *IN LIMINE* . . . . . . . . . . . . . 1

ALLOW THE VIDEO-RECORDED DEPOSITION OF A WITNESS
WHO IS OUTSIDE THE COURT'S SUBPOENA POWER . . . . . . . . . . . . . . . . . . 1

    I.    Relationship Between Ms. De Jesus and Mr. Francis . . . . . . . . . . . . . . 1

    II.    The Requested Deposition Is Warranted Under Rule 15 . . . . . . . . . . 3

PRECLUDE MR. FRANCIS'S TESTIMONY REGARDING MR.
DOLAN'S JOB RESPONSIBILITIES, MOTIVES, AND THE LIKE . . . . . . . . . . 5

PRECLUDE IRRELEVANT AND UNFAIRLY PREJUDICIAL
EVIDENCE UNRELATED TO AN "OFFICIAL ACT" OR
"OFFICIAL DUTY" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    Meaning Of "Official Act" And "Official Duty" . . . . . . . . . . . . . . . . . 9

          A.    "Official Act" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          B.    "Official Duty" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    II.    Review Of Evidence That Should Be Precluded . . . . . . . . . . . . . . . . . 10

          A.    Navy Payment To GDMA Related To USS Kitty
Hawk's Cancelled Port Visit to Hong Kong In
November 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          B.    Late Payments To GDMA By Submarine Group Seven . . . . 10

          C.    Billing Dispute Between GDMA And Singapore FISC
Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          D.    Navy's Outstanding Payment Issues For Seventh Fleet
Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          E.    Pressure To Close Navy's Hong Kong Ship Support Office 12

COMPEL DISCOVERY ABOUT "COOPERATORS" . . . . . . . . . . . . . . . . . . . . . . 12

ALLOW DEFENSE COUNSEL TO ASK LEADING QUESTIONS ON
DIRECT EXAMINATION OF GOVERNMENT AGENTS, AND
PRECLUDE LEADING QUESTIONS DURING "CROSS" . . . . . . . . . . . . . . . . . 13

PRECLUDE EVIDENCE OF HEARSAY STATEMENTS BY
"COOPERATORS". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ALLOW DEFENSE COUNSEL TO ELICIT EVIDENCE OF WITNESSES'
PRIOR INCONSISTENT STATEMENTS THROUGH THE CASE AGENT . . 16

EXCLUDE EVIDENCE REGARDING PROSTITUTION, OTHER THAN
AS A "THING OF VALUE" OFFERED BY LEONARD FRANCIS .......... 19

PRECLUDE COOPERATORS' TESTIMONY THAT THEY ARE OBLIGATED
TO "TELL THE TRUTH," WHICH AMOUNTS TO SELF- AND
PROSECUTORIAL-VOUCHING ........................................... 20

SEVER DEFENDANTS FOR TRIAL, OR PRECLUDE EVIDENCE
THAT VIOLATES *BRUTON* ................................................. 23

CONCLUSION ....................................................... 25

**NOTICE OF MOTIONS *IN LIMINE* AND MOTIONS *IN LIMINE***

At the date and time set out above, James Dolan will move the Court to grant the motions *in limine* listed in the caption, which are supported by the briefing below.

### ALLOW THE VIDEO-RECORDED DEPOSITION OF A WITNESS WHO IS OUTSIDE THE COURT'S SUBPOENA POWER

Mr. Dolan requests leave to take the deposition of Morena De Jesus, a former romantic partner of the government's key trial witness, Leonard Francis, and the mother of two of his children. She can provide compelling negative character testimony about Mr. Francis, which is admissible under Federal Rules of Evidence 608 and 404(b). For the reasons given below, her deposition is warranted under Federal Rule of Criminal Procedure 15.

## I.   Relationship Between Ms. De Jesus and Mr. Francis

Ms. De Jesus is a citizen of the Philippines, but she met Mr. Francis in 2004 in Singapore, where she was working at a hotel to complete training as part of her undergraduate degree program in the Philippines. Mr. Francis was a guest at the hotel and began to pursue Ms. De Jesus, claiming to be divorced. That pursuit continued after Ms. De Jesus returned to the Philippines. The two subsequently met for vacations in Hong Kong and eventually the relationship became intimate, with Mr. Francis promising to marry Ms. De Jesus. Ms. De Jesus was twenty-three years old at the time, Mr. Francis about forty.

To Ms. De Jesus's knowledge, during this time period Mr. Francis opened a business office in Manila and the two spent progressively more time together as the relationship grew more serious. Ms. De Jesus became pregnant with Mr. Francis's child, and on September 28, 2007, she gave birth to Leonardo Gabriel De Jesus Francis. The two had a second child, Alessandra Luisa De Jesus Francis, on October 10, 2008. When he was in the Philippines, Mr. Francis would stay with Ms. De Jesus and the children at residences he maintained there, first in Manila, then in Makati City.

In December 2009, Mr. Francis convinced Ms. De Jesus to travel to Singapore with him and the children. On April 2, 2010, he convinced Ms. De Jesus to return to the Philippines, to visit his business there for him. When Ms. De Jesus got to the apartment they shared in Makati City, she found the lease had been canceled and she could not get in. She tried to fly back to Singapore, but the return ticket Mr. Francis had booked for her had been canceled. Mr. Francis would not respond to her attempts to contact him, and it became evident that he had abandoned her and abducted the children. As Ms. De Jesus made frantic inquiries, she learned for the first time that Mr. Francis was married.

Ms. De Jesus continued to try to contact Mr. Francis, but he refused to speak to her and replied with intimidating messages, threatening, among other things, that she would never see her children again. Ms. De Jesus didn't have the resources at the time to fight Mr. Francis, who was twice her age and very wealthy. Thus, she began working in the Philippines so she could earn money and hire a lawyer.

In July 2010, she initiated legal proceedings in the Philippines, to gain custody of her children. Mr. Francis was served with a summons that same month and proceeded to contest Ms. De Jesus's efforts to obtain custody through an attorney he hired in the Philippines. But on May 23, 2011, the Regional Trial Court of the Philippines found for Ms. De Jesus and awarded her custody of the children. Mr. Francis, however, refused to disclose where the children were, or to return them to their mother. As a result, a warrant for his arrest was issued in the Philippines on July 29, 2011, a copy of which is attached as Exhibit A.

Ms. De Jesus eventually sought a "mirror" custody order in Singapore, and on October 28, 2014, the Family Justice Courts of the Republic of Singapore entered an order (Exhibit B) that gave full effect to the May 23, 2011 custody order entered by the Philippines' court. Of course, by October 2014 Mr. Francis was in custody in the United States, and he has made no effort to comply with that order since, nor to

communicate to Ms. De Jesus where her children are.[1]

In sum, Mr. Francis established a relationship with Ms. De Jesus based on deceit, which culminated in his lying to her so he had the opportunity to kidnap her children, and then defying lawful court orders to return the children. Ms. De Jesus therefore has ample foundation to testify as to Mr. Francis's appallingly bad character under Federal Rules of Evidence 608(a) and 404(b)(2).

Given that Mr. Francis's testimony – and therefore credibility – will be central to the government's trial case, Mr. Dolan seeks Ms. De Jesus's testimony for trial. However, Ms. De Jesus is now living and working abroad, and she is unwilling to travel to the United States for the trial, given the current COVID-19 situation and the hardship traveling here would impose on her. Under the circumstances, it is appropriate for the Court to allow Mr. Dolan to take her deposition under Rule 15, and preserve the same as her trial testimony. Mr. Dolan now turns to that Rule.

## II. The Requested Deposition Is Warranted Under Rule 15

Federal Rule of Criminal Procedure 15(a) provides for deposing witnesses, and states, in relevant part:

> A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interests of justice.

In *United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998), the Ninth Circuit noted that "[o]rdinarily, exceptional circumstances exist when the prospective witness is unavailable for trial and the absence of the testimony would result in an injustice." *Id.*; *see also United States v. Drogul*, 1 F.3d 1546, 1552 (11th Cir. 1993)

---

[1] Although defense counsel have not seen Mr. Francis's conditions of release/medical furlough, presumably they include (explicitly or implicitly) some requirement that Mr. Francis remain law-abiding, and his long-term evasion of the custody orders, and warrant for his arrest, don't qualify. Perhaps the Court can use its power over Mr. Francis's conditions of release to bring some long-awaited relief to Ms. De Jesus from the immeasurable pain inflicted on her by Mr. Francis.

(same). "The principal consideration guiding whether the absence of a particular witness's testimony would produce an injustice is the materiality of that testimony to the case." *Id.*

It is important to note that in deciding whether to order a deposition, the issue is not whether the witness will be unavailable for trial: the Rule "does not require any conclusive showing of 'unavailability' before a deposition can be taken in a criminal case." *United States v. Sines*, 761 F.2d 1434, 1439 (9th Cir. 1985). "It would be unreasonable and undesirable to require [a party] to assert with certainty that a witness will be unavailable for trial months ahead of time, simply to obtain authorization to take h[er] deposition." *Id.* "Whenever a prospective witness is unlikely to appear at trial and his or her testimony is critical to the case, simple fairness requires permitting the moving party to preserve that testimony – by deposing the witness – absent significant countervailing circumstances which would render the taking of the deposition unjust." *Drogul*, 1 F.3d at 1552; *see also id.* at 1553 (stating that ordering of deposition is appropriate "whenever a substantial likelihood exists that the proposed deponent will not testify at trial"). Accordingly, in *Drogul* the court found foreign depositions appropriate for foreign nationals – even those who indicated they would be willing to come to the United States and testify at trial – because they were beyond the subpoena power of the district court. *Id.* at 1553-57; *see also United States v. Medjuck*, 156 F.3d 916, 920 (9th Cir. 1998). Similarly, the court in *Sanchez-Lima* held that depositions should have been ordered because defense witnesses in Mexico were beyond the subpoena power of the district court. 161 F.3d at 547-48.

There is no doubt that Ms. De Jesus's testimony is material, because it is devastating with respect to the credibility of the government's key trial witness. Furthermore, among the potential defense witnesses, Ms. De Jesus has uniquely intimate knowledge of Mr. Francis's character. And, as the Supreme Court has held, even if evidence "goes only to the credibility of [a] witness" it is nonetheless critical

4

because a "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . ." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Accordingly, Mr. Dolan moves for the Court to order the deposition of Ms. De Jesus. Furthermore, consistent with the regular practice in civil proceedings since the onset of COVID-19, he requests that the Court order that the deposition be taken by video teleconference. As for the logistics, Mr. Dolan proposes that the parties attempt to work those out cooperatively, and if that fails they will seek the Court's intervention.

### PRECLUDE MR. FRANCIS'S TESTIMONY REGARDING MR. DOLAN'S JOB RESPONSIBILITIES, MOTIVES, AND THE LIKE

In his statements to agents and prosecutors as part of his "cooperation," Mr. Francis has said several things about Mr. Dolan's job responsibilities and motives, statements for which he lacks foundation and that are otherwise inadmissible. Those statements, addressed below, should be precluded.

1. One of the indictment's central allegations regarding Mr. Dolan relates to a Hong Kong port visit by the USS Kitty Hawk scheduled for November 2007, which was canceled because the Chinese government denied diplomatic clearance. Indictment paragraph 36, subparagraph A79, alleges that after that cancellation, Mr. Dolan assisted Mr. Francis with GDMA's efforts to timely collect a "cancellation settlement" from the Navy, which GDMA was indisputably due based on expenses it incurred in preparation for the Kitty Hawk's port visit.

During his statements to agents and prosecutors, Mr. Francis has repeatedly opined that Mr. Dolan's involvement in that situation was (1) "outside the scope" of Mr. Dolan's job, (2) "completely inappropriate given his position," and (3) "totally unethical for someone in his position." Mr. Francis does not have adequate foundation to opine about the scope of Mr. Dolan's job, and for that reason alone any testimony of this nature should be precluded. Furthermore, the Court should preclude

*any* testimony regarding ethics or ethical violations, because this case is about a claim of bribery, not ethics, and allowing testimony about the latter is therefore irrelevant and risks unfair prejudice under Federal Rule of Evidence 403. *See also Skilling v. United States*, 561 U.S. 358, 410 (2010) (rejecting application of honest services fraud to claims of "undisclosed self-dealing by a public official . . . *i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty").

2. Another of the indictment's central allegations against Mr. Dolan is that he got involved in resolving late payments to GDMA from the Seventh Fleet's submarine group. Specifically, indictment paragraph 36, subparagraph A81, alleges that in December 2007, Mr. Dolan assisted Mr. Francis by pressuring the Navy's Submarine Group 7 to pay overdue bills to GDMA for husbanding expenses related to two submarine port visits. Mr. Dolan allegedly provided this assistance to GDMA by emailing Sub-Group 7 personnel with an admonishment to pay the bills if they were due. And indictment paragraph 36, subparagraph A99, alleges that in April 2008, Mr. Dolan again pressured Sub-Group 7 personnel, and personnel with the Commander of Submarine Forces Pacific, to timely pay bills for services GDMA rendered to submarines during port visits.

In this context, too, Mr. Francis has made statements to agents and prosecutors that (1) it was "totally unethical for someone in [Mr. Dolan's] position" to get involved in resolving the late payment issues, (2) it was "totally inappropriate" for Mr. Dolan to get involved, (3) these issues should have been handled by more junior staff, and (4) the "appropriate appeals process would have been to go through Navy contracting or accounting offices." Again, these are opinions for which Mr. Francis does not have an adequate (or any) foundation, thus any such testimony, or testimony like it, should be precluded.

3. Mr. Francis also told agents and prosecutors that Mr. Dolan had the "ability to write contractual scopes of work" for GDMA's contracts with the Navy. Again,

this is a claim for which he has no foundation, thus any such testimony, or testimony like it, should be precluded.

4. Similarly, Mr. Francis told agents and prosecutors that Mr. "Dolan was able to specify force protection requirements [for contracts] and did so in a manner to favor GDMA." This, too, is a statement for which Mr. Francis lacks foundation, thus any such testimony, or testimony like it, should be precluded.

5. Mr. Francis also told agents and prosecutors that the "Seventh Fleet had the money to spend," Mr. Dolan "held the purse to the fleet," and Mr. Dolan "could turn policies and could reach out to all the Suppos of 7th Fleet as the 'big dog' from supply." Mr. Francis lacks foundation for these statements, and they reflect his profound misunderstanding of how the Seventh Fleet worked and of Mr. Dolan's job responsibilities. Accordingly, any such testimony, or testimony like it, should be precluded.

6. Mr. Francis also opined to agents and prosecutors about Mr. Dolan's alleged motives and feelings, such as telling them that Mr. Dolan "put GDMA's interests in front of the Navy," and Mr. Dolan might have justified his actions as doing what was best for Navy, but he was "also interested in cultivating [his] relationship with Francis for personal benefit." Mr. Francis has no foundation to testify about what he believed were Mr. Dolan's motives or purpose.

The statements addressed above have one thing in common: they reflect Mr. Francis's desire to tell agents and prosecutors what he believes they want to hear, with his end goal being a shorter custodial sentence. Of course, Mr. Francis is smart enough to know that the main event in that effort will be his trial testimony, and he will undoubtedly try to slip in the types of statements set out above to "sweeten" the government's case. Indeed, it is quite likely that Mr. Francis will have read these motions *in limine* prior to trial, or that he will know their substance, given that he sends his counsel to every court hearing. Accordingly, Mr. Dolan requests that the Court order the government to admonish Mr. Francis not to give the testimony

discussed above, or anything like it, and that the testimony he does give must stick to what he did and observed, and not venture into opinions and claims about things for which he lacks sufficient foundation or knowledge. Mr. Dolan requests that the Court order the government to proceed likewise.

## PRECLUDE IRRELEVANT AND UNFAIRLY PREJUDICIAL EVIDENCE UNRELATED TO AN "OFFICIAL ACT" OR "OFFICIAL DUTY"

As discussed in pretrial motions, the indictment does not allege a time and place where Mr. Dolan allegedly entered into the unlawful bribery agreement that is at the heart of all the charges in this case. Instead, the government evidently seeks to introduce evidence of things that Mr. Dolan said and did, and from that have the jury infer that at some prior time Mr. Dolan must have agreed to (1) do or influence an official act on Mr. Francis's behalf, and/or (2) do, or omit to do, his "official duty" on Mr. Francis's behalf. Every offense charged relies on one or both of these theories, even the honest services wire fraud charge, because it incorporates the definintion of bribery found in 18 U.S.C. §201(b). *See McDonnell v. United States*, 136 S. Ct. 2355, 2365 (2016).

The problem with the government's "official act" and "official duty" theories is that much of what is alleged in the indictment with respect to Mr. Dolan does not amount to him (1) doing or seeking to influence an "official act," or (2) doing, or omitting to do, something in violation of his "official duty." It is possible, of course, that conduct that does not itself qualify as (1) doing or seeking to influence an "official act" or (2) being in violation of an official's duty could nonetheless be relevant to showing that a defendant agreed to do or influence an official act, or to act in violation of his "official duty." *McDonnell*, 136 S. Ct. at 2371. But the conduct discussed below checks none of those boxes – that is, none of it is tied to an official act or to Mr. Dolan violating his official duty. Thus, the conduct addressed below is not relevant under Federal Rule of Evidence 401.

Furthermore, the Court should exclude the evidence discussed below because

any probative value it has is "substantially outweighed by the danger" of "unfair prejudice, confusing the issues, [and] misleading the jury," because the jury will likely conclude, mistakenly, that the subject evidence amounts to an official act, influencing an official act, or acting in violation of Mr. Dolan's official duty.  Fed. R. Evid. 403.  Relatedly, the government would consume a great deal of time presenting the subject evidence, leading to "undue delay [and] wasting time." *Id.*

With this framework in mind, below Mr. Dolan first briefly summarizes the meaning of "official act" and his "official duty."  In that regard, he draws directly from what he submitted with respect to his requested jury instructions on August 5, 2021 (docket #516), and he doesn't repeat his extensive supporting briefing here. After setting out the meaning of those terms, he turns to addressing how several aspects of the government's case, as set out in the indictment, are irrelevant to proving an "official act" or "official duty" offense, and thus should be precluded under Federal Rules of Evidence 401 and 403.

## I.   Meaning Of "Official Act" And "Official Duty"

### A.   "Official Act"

Not every action taken by a public official qualifies as an "official act" under 18 U.S.C. §201(b)(2)(A).  An "official act" means a decision or action on a question or matter involving the formal exercise of governmental power.  The question or matter must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.  Thus, for example, arranging a meeting, hosting an event, or giving a speech do not qualify as official acts.  Furthermore, to qualify as an "official act," the question or matter involved must have been (a) pending, or be able by law to be brought, before a public official, and (b) something specific and focused, and relatively circumscribed, rather than a broad objective.

### B.   "Official Duty"

Not everything a public official does, or omits to do, as part of that public official's job is considered to have been within his "official duty" under 18 U.S.C.

§201(b)(2)(C).  Instead, in the context of the offenses charged here, "official duty" means only the duty that Mr. Dolan had, as a Navy official, to protect and defend the United States.  Accordingly, to find that Mr. Dolan agreed to do, or omit to do, an act in violation of his official duty, the jury must find that he agreed to do, or omit to do, an act that violated his official duty to protect and defend the United States.

## II.   Review Of Evidence That Should Be Precluded

With these definitions in mind, Mr. Dolan moves to preclude any evidence with respect to the following things charged in the indictment, nearly all of which amount to allegations that Mr. Dolan assisted Mr. Francis with collecting on GDMA bills that the Navy failed to pay in a timely manner.

### A.   Navy Payment To GDMA Related To USS Kitty Hawk's Cancelled Port Visit to Hong Kong In November 2007

As discussed with respect to the preceding motion *in limine*, in November 2007 a Hong Kong port visit by the USS Kitty Hawk was canceled due to the Chinese government's denying diplomatic clearance.  Indictment paragraph 36, subparagraph A79, alleges that after that cancellation, Mr. Dolan assisted Mr. Francis with GDMA's efforts to collect from the Navy a "cancellation settlement," payment that GDMA was rightly due based on expenses it incurred in preparation for the Kitty Hawk's port visit.

Seeking to help Mr. Francis have a bill paid in a timely manner does not qualify as influencing an "official act," or acting in violation of an "official duty," and thus any evidence in this regard should be precluded for the reasons set out above (*i.e.*, relevance and the danger of unfair prejudice, *et cetera*, under Rule 403).

### B.   Late Payments To GDMA By Submarine Group Seven

As discussed with respect to the preceding motion *in limine*, indictment paragraph 36, subparagraph A81, alleges that in December 2007 Mr. Dolan assisted Mr. Francis by pressuring the Navy's Submarine Group 7 to pay overdue bills to GDMA for husbanding expenses related to two submarine port visits.  Mr. Dolan

allegedly provided this assistance to GDMA by emailing Sub-Group 7 personnel with an admonishment to pay the bills if they were due.

Indictment paragraph 36, subparagraph A99, alleges that in April 2008, Mr. Dolan again pressured Sub-Group 7 personnel, and personnel with the Commander of Submarine Forces Pacific, to timely pay bills for services GDMA rendered to submarines during port visits.

As with the Kitty Hawk cancellation settlement issue, seeking to help Mr. Francis have the Navy pay GDMA's bills in a timely manner does not qualify as influencing an "official act," or acting in violation of an "official duty," thus any evidence in this regard should be precluded for the reasons set out above (*i.e.*, relevance and the danger of unfair prejudice, *et cetera*, under Rule 403).

## C.   "Billing Dispute" Between GDMA And Navy's Singapore FISC Office

Indictment paragraph 36, subparagraph 105, alleges that on May 5, 2008, Mr. Francis asked Mr. Dolan to get involved in a "billing dispute" between GDMA and the Navy's Singapore Fleet Industrial Supply Center (FISC) office.   The email referenced in that subparagraph relates to Mr. Dolan seeking to ensure that members of a Navy construction battalion in Samar were provided support.   That isn't a billing dispute.   Instead, it involved Mr. Dolan ensuring that Navy personnel in his area of responsibility were properly supported.   That does not implicate influencing an "official act," or Mr. Dolan acting contrary to his "official duty," as those terms are defined above.   Thus any evidence in this regard should be precluded under Rules 401 and 403, for the reasons discussed above.

## D.   Navy's Outstanding Payment Issues For Seventh Fleet Units

Indictment paragraph 36, subparagraph A127, alleges that in or about October 2008, Mr. Dolan offered to Mr. Francis to try to resolve any outstanding late payment issues between GDMA and Seventh Fleet units.   This should be precluded for the same reasons as the evidence with respect the late payment issues discussed above.

11

1

## E.    Pressure To Close Navy's Hong Kong Ship Support Office

2    Indictment paragraph 36, subparagraph A81, alleges that in December 2007,

3  Mr. Dolan exerted pressure on Navy personnel to close, or reduce staffing, at the

4  Navy's Hong Kong Ship Support Office (SSO).   The government's theory is

5  evidently that Mr. Francis wanted that SSO closed, or personnel reduced, because that

6  would lead to reduced government oversight of GDMA in Hong Kong.

7    Similarly, indictment paragraph 36, subparagraph A141, alleges that on

8  December 1, 2008, Mr. Dolan advised other Navy officials to close or realign the

9  duties of the Hong Kong SSO.

10    Seeking to reduce the number of people assigned to the Hong Kong SSO does

11  not qualify as influencing an "official act," or acting in violation of an "official duty,"

12  and thus any evidence in this regard should be precluded under Rule 403 for the

13  reasons set out above.

14
## COMPEL DISCOVERY ABOUT "COOPERATORS"

15    Mr. Dolan's understanding is that the Court has kept under submission, or

16  denied as premature and subject to renewal, motions by his co-Defendants to compel

17  *Brady/Giglio* material with respect to Leonard Francis.   Mr. Dolan joins those

18  outstanding motions, and also moves to compel production of the following materials

19  requested from the government with respect to Mr. Francis and another witness that

20  Mr. Dolan anticipates will testify under a cooperation agreement, Jose Sanchez.

21    Specifically, Mr. Dolan requests that the Court compel production of the

22  following materials, which he requested from the government in a letter dated July

23  9, 2021, quoted here:

24    1. Please provide the complete written plea agreements, and information
about any benefits or potential benefits not included in those writings,
25    for any potential government trial witness who has a cooperation
agreement with the government.   I anticipate that includes at least
26    Leonard Francis and Jose Sanchez. . . .   Notably, I don't have the
cooperation addenda to the plea agreements for either Mr. Francis or Mr.
27    Sanchez.  Furthermore, I request the proffer agreement signed by Mr.
Sanchez.  Note that these specific requests are not meant to limit the
28    breadth of my request, which applies to any witness who will testify and

has a benefit(s) agreement with the government, written or unwritten.

2.    Relatedly, I note that Messrs. Francis's and Sanchez's plea agreements obligate them to provide an accounting of their financial information, and I request all such materials and information.

3. I note that Mr. Francis's plea agreement allows him to spend money on family expenses. I request any materials or information related to such expenditures.

4.  I request any materials or information related to restitution or forfeiture orders or payments made by any cooperating witness, including Messrs. Francis and Sanchez. I note that at least Mr. Francis's plea agreement foreshadows developments in this regard (that is, an impending restitution order and forfeiture payments) that should have occurred by now.

5. As you will recall, Judge Sammartino indicated that we would re-visit discovery relating to Mr. Francis's "medical furlough" as trial approached. In that regard, I request any materials or information related to Mr. Francis's living situation since he has been released from pretrial custody, such as where he has been living, at what expense, who has paid those expense, what is the security arrangement (*e.g.*, is he guarded, by how many guards), under what conditions he may and has left the location of his "confinement," has he traveled, and what are the conditions of his release. I understand there is a log of his visitors during his furlough, and I request a copy of that.

6. I request a copy of Mr. Francis's and Mr. Sanchez's (and any other cooperating witnesses') presentence reports, and specifically any portions of the report that relate to acts of dishonesty, criminal history, medical conditions and drug or alcohol use and abuse, and the probation officer's Guidelines calculations. With respect to the last, I expect to present to the jury that Mr. Francis and Mr. Sanchez received front-end benefits in their plea agreements, which may be evidenced in part by the Guidelines calculations done by the probation officer(s).

## ALLOW DEFENSE COUNSEL TO ASK LEADING QUESTIONS ON DIRECT EXAMINATION OF GOVERNMENT AGENTS, AND PRECLUDE LEADING QUESTIONS DURING "CROSS"

During his case-in-chief, Mr. Dolan anticipates that he will call at least one government agent who was involved in investigating this case, and he will likely call more than one. He moves to (1) be permitted to use leading questions during his direct examination of any such witness, and (2) preclude the government from using leading questions during its "cross" of any such witness.

With respect to (1), Federal Rule of Evidence 611(c) permits leading questions "when a party calls a hostile witness, an adverse party, or a witness identified with an

adverse party," and there is no doubt the government agents involved in investigating this case qualify.

With respect to (2) above, Rule 611(c) says that "*[o]rdinarily*, the court should allow leading questions . . . on cross examination" of such a witness. (Emphasis added.)  The 1972 Advisory Committee Notes explain that "[t]he purpose of the qualification 'ordinarily' is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the 'cross-examination' of a party by his own counsel after being called by the proponent (savoring more of re-direct) . . . ." "[W]hen a witness identified with an adverse party is called, the roles of the parties are reversed.  Leading questions [are] appropriate on direct examination but not on cross-examination."  *Alpha Display Paging, Inc. v. Motorola Comm. and Elec., Inc.*, 867 F.2d 1168, 1171 (8th Cir. 1989).  Accordingly, courts have the "power to require a party cross-examining a friendly witness to employ non-leading questions."  *Ardoin v. J. Ray McDermott & Co.*, 684 F.2d 335, 336 (5th Cir. 1982).  The circumstances in this case warrant exercising that power.  *See, e.g., Lozada-Rodriguez v. Humacao*, 2014 WL 652266, *1 (D.P.R. 2014) (defense counsel precluded from asking leading questions during "cross-examination" of defendant and witness identified with defendant); *United States v. Hansen*, 583 F.2d 325, 328 (7th Cir. 1978) (father barred from using leading questions during cross of son).

## PRECLUDE EVIDENCE OF HEARSAY STATEMENTS BY "COOPERATORS"

Many people who were interviewed with respect to this case gave multiple statements to investigators, especially the cooperating witnesses.  In many instances those witnesses gave conflicting statements from one interview to the next.  As a generic example, a cooperating witness said "not X" with respect to a material fact during an interview in 2015, and "X" during an interview about the same fact in 2016.

During trial, if that cooperating witness testifies to "X," Mr. Dolan will elicit

evidence that the witness previously said "not X" during the 2015 interview.  Because the "not X" statement is introduced to impeach, and not for its truth, it is not barred by the hearsay rule.  *See United States v. Bao*, 189 F.3d 860, 865-66 (9ᵗʰ Cir. 1999). The government may then seek to respond by eliciting evidence that during the witness's 2016 interview he said "X."  That, of course, would be introduced to prove the truth of the matter asserted, and thus is barred by the hearsay rule.[2]

The government may nonetheless argue that if Mr. Dolan seeks to impeach the witness in the manner indicated (*i.e.*, by eliciting evidence of the witness's prior statement "not X"), the government may rebut that impeachment by eliciting evidence of the prior consistent statement (*i.e.*, statement "X") under Federal Rule of Evidence 801(d)(1)(B).  That Rule allows a party to introduce evidence "about a prior statement" that "is consistent with the declarant's testimony and is offered . . . to rebut . . . [a] charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."  However, that Rule has an important temporal limitation:  "the prior consistent statement" that is sought to be introduced to rebut the inference of falsity "must [have been] made prior to the time that the supposed

_____

[2] *See United States v. Romo-Chavez*, 681 F.3d 955, 959 (9ᵗʰ Cir. 2012) ("When an out-of-court statement is offered to prove the truth of the matter asserted, it is hearsay and generally inadmissible"); *United States v. Check*, 582 F.2d 668, 681 (2d Cir. 1978) ("a witness's prior statements offered to prove the truth of the matters asserted therein are not immunized from the proscriptive effect of the hearsay rule"); *see also* 2 *McCormick on Evidence* §251 (8th ed. 2020) ("The traditional view has been that a prior statement, even one made by the witness, is hearsay if it is offered to prove the matters asserted therein"); Robert R. Little & Stephen L. Rispoli, *The Hearsay Paradox: Declarant-Witnesses' Own Out-of-Court Statements*, 70 Baylor L. Rev. 843, 877 (2018) ("A witness's own out-of-court statement offered for the truth of the matter asserted is hearsay"); Daniel J. Capra, *Prior Statements of Testifying Witnesses: Drafting Choices to Eliminate or Loosen the Strictures of the Hearsay Rule*, 84 Fordham L. Rev. 1429, 1453 (2016) (noting the "forty years of practice in which prior witness statements have been evaluated as hearsay").

motive to falsify arose." *United States v. Collicott*, 92 F.3d 973, 979 (9th Cir. 1996); *see also Tome v. United States*, 513 U.S. 150, 158 (1995). In the example given above, the cooperator's prior statement does not qualify because he had a motive to lie – to please the government and get a break on his sentence – from the moment he entered into the cooperation process.

Accordingly, when Mr. Dolan elicits evidence of a statement of a cooperating witness that is inconsistent with his trial testimony, the government should be precluded from introducing a prior consistent statement to rebut an inference of fabrication, unless and until the Court rules that the prior consistent statement was made prior to the time the witness had a motive to fabricate. Mr. Dolan is confident that this "unless" exception will never come into play.

## ALLOW DEFENSE COUNSEL TO ELICIT EVIDENCE OF WITNESSES' PRIOR INCONSISTENT STATEMENTS THROUGH THE CASE AGENT

In reviewing government agents' and investigators' reports of witness statements, Mr. Dolan's counsel has identified several witness statements that are good for the defense. In the event any such witness testifies at trial inconsistently with such a prior statement – for example, to please the government – Mr. Dolan will impeach that witness by offering evidence of his/her prior inconsistent statement. The most obvious way to do that it to call the agent who wrote the report indicating the witness's prior inconsistent statement.

As the Court is aware, however, there were/are many government agents/investigators involved in this case. As a consequence, the prior statements in which Mr. Dolan is interested were made to many different agents or investigators. Having to call many of them during trial to achieve the purpose set out above will be cumbersome and time consuming. Consequently, counsel for Mr. Dolan sent an email to government counsel on July 10, 2020 (*i.e.*, more than a year ago), stating:

> I am writing to give you a heads up re government investigator trial witnesses, and to determine if you want to come an agreement that limits the number of such people that I need to subpoena, and that will need to

16

appear (or at least be on standby).

I have compiled a long list of investigator witnesses based in large part on identifying witness statements that are important to our defense in some way and identifying the investigator(s) to whom such statements were made. If at trial any witness makes an inconsistent statement, I will then need to call the investigator(s) to whom the statement was made to introduce evidence of the prior inconsistent statement. This circumstance will, of course, require me to have many investigator witnesses effectively on standby.

An obvious way to limit the resource drain and cost to the government of my issuing trial subpoenas to all of those investigators, and to streamline the trial some, is for us to agree that I can elicit prior inconsistent statements by calling the case agent to testify about what is in other investigators' reports in that regard. Let me know if you are willing to enter into a stipulation in that regard, which I would want to have filed with the court well before trial (thereby obviating the need for me to subpoena all such witnesses). The stipulation would simply be to the effect that you will not raise a hearsay objection in the circumstances indicated, not that you otherwise agree that any statement is admissible – that is, you'd be free to argue that the prior statement is not inconsistent, should be precluded under 401 or 403 ground, etc.

If you are not interested in entering into such a stipulation, you may want to put out word to the investigators who took witness statements that they should be prepared to appear at trial (even if you were not intending to call them), because I know many may be in far-flung places.

Counsel for the government responded, "This seems like an issue that's more susceptible to a productive discussion closer to or during trial, though in the meantime we have alerted the agent team of this possibility."

The problem with this response is that issuing subpoenas to agents in accordance with *Touhy* regulations is not a simple process, nor is bringing witnesses from the far-flung places where some of them are undoubtedly posted and/or living now. Accordingly, Mr. Dolan has so-far issued subpoenas for eleven agent witnesses, consistent with the *Touhy* regulations (*e.g.*, served on the General Counsel for the Department of Defense and the Navy).

But presenting the subject evidence of prior inconsistent statements through several witnesses will be unnecessarily time consuming and unwieldy. Accordingly, Mr. Dolan moves for the Court to order that he may put on any such evidence through the case agent. As a simplified example, that would work like this: (1) "Witness

1    Jones" testifies that the car was blue, but a report written by "Agent Smith" says that

2    "Witness Jones" previously said, during an interview, that the car was red; thus (2)

3    Mr. Dolan would elicit, through "Case Agent McWhirter," that "Agent Smith's"

4    report indicates that "Witness Jones" previously said the car was red.  Proceeding in

5    this manner is consistent with the hearsay rule, because evidence of prior inconsistent

6    statements is considered to be introduced to impeach a witness's credibility, rather

7    than as proof of the substance/truth of the prior statement.  As the Ninth Circuit has

8    explained:

9           "A basic rule of evidence provides that prior inconsistent statements
            may be used to impeach the credibility of a witness."  *United States v.*
10          *Monroe*, 943 F.2d 1007, 1012 (9th Cir.1991) [citations omitted].  A prior
            inconsistent statement is admissible to raise the suggestion that if a
11          witness makes inconsistent statements, then his entire testimony may not
            be credible; such an inference does not depend on whether either the
12          prior statement or the subsequent in-court statement is true.  *See United*
            *States v. Arteaga*, 117 F.3d 388, 397 n.18 (9th Cir. 1997) ("If a witness
13          says 'X' on the stand, his out-of-court statement 'not-X' impeaches him,
            whether X is true or not") [cert. denied citation omitted].  Therefore,
14          because a declarant's prior inconsistent statement is not offered for its
            truth, it is not hearsay.  *See id.* at 397.

15

16   *United States v. Bao*, 189 F.3d 860, 865-66 (9th Cir. 1999).

17          While Mr. Dolan could stop there, he notes that his proposed course is also

18   consistent with the "Residual Exception" to the hearsay bar, which states:

19          **(a) In General.**  Under the following conditions, a hearsay statement is
            not excluded by the rule against hearsay even if the statement is not
20          admissible under a hearsay exception in Rule 803 or 804:

21                 **(1)** the statement is supported by sufficient guarantees of
                   trustworthiness – after considering the totality of
22                 circumstances under which it was made and evidence, if
                   any, corroborating the statement; and

23
                   **(2)** it is more probative on the point for which it is offered
24                 than any other evidence that the proponent can obtain
                   through reasonable efforts.

25
            **(b) Notice.**  The statement is admissible only if the proponent gives an
26          adverse party reasonable notice of the intent to offer the statement –
            including its substance and the declarant's name – so that the party has
27          a fair opportunity to meet it.  The notice must be provided in writing
            before the trial or hearing – or in any form during the trial or hearing if
28          the court, for good cause, excuses a lack of earlier notice.

Fed. R. Evid. 807.  With respect to reasonable written notice, Mr. Dolan hereby gives such notice.  However, he cannot provide notice of the declarant's name and the substance of the statement, because that will depend on how things play out at trial. As far as "reasonable efforts," it is unreasonable to call several witnesses to testify about what is stated in government agents' reports that were produced by the government in discovery, when one witness will do.  And while Mr. Dolan may surely contest the accuracy of what agents wrote in their reports, the government is ill-positioned to do so.

At any rate, the Court need not consider the residual exception, because the first argument carries the day.  Accordingly, Mr. Dolan requests that the Court permit him to proceed at trial in the manner described above, but he notes that he will not cancel the subpoenas he has already served, in case any issues arise in this context (*e.g.*, a witness attempts to "clarify" his prior inconsistent statement in a way that arguably warrants calling the agent who wrote the subject report).

## EXCLUDE EVIDENCE REGARDING PROSTITUTION, OTHER THAN AS A "THING OF VALUE" OFFERED BY LEONARD FRANCIS

As the Court is aware, the government has alleged that one of the "things of value" that Leonard Francis offered, and the Defendants received, were the services of prostitutes.  That evidence is, of course, inflammatory – indeed, the parties are in agreement that the Court should inquire about unfair prejudice in this regard during *voir dire*.

Mr. Dolan submits that the government could easily present its case without presenting evidence that any Defendant consorted with a prostitute, because:  (1) the issue is whether there was an unlawful *quid pro quo* agreement, and the government need not show that any Defendant had sex with anyone to prove that; and (2) the government alleges that the Defendants received many things of value other than the services of prostitutes, thus the prostitution evidence could be excluded without unfairly prejudicing the government.  Accordingly, Mr. Dolan moves to preclude any

evidence relating to prostitution under Rule 403.

Understanding that the Court may reject that position, however, Mr. Dolan requests that the Court at least preclude the government from introducing or seeking to elicit any evidence of any Defendant using the services of a prostitute that is unrelated to Leonard Francis providing the services of prostitutes for a Defendant (or Defendants).  For example, the government should be precluded from:  (1) asking a Defendant if he ever paid for, or used, the services of a prostitute; or (2) eliciting from a witness that he heard or witnessed a Defendant engage the services of a prostitute. That evidence is irrelevant and unfairly prejudicial, and thus should be precluded under Rules 401, 403, and 404.  *See, e.g., United States v. Jackson*, 806 Fed. App'x. 533, 535 (9th Cir. 2020) (unpublished) (sustaining on Rule 403 grounds a district court's exclusion of a witness's "other acts of prostitution," unrelated to the acts of prostitution involved in the offense conduct).  The government should not only be precluded from eliciting such testimony or evidence, it should also be ordered to admonish its witnesses not to offer any such testimony or evidence.

## PRECLUDE COOPERATORS' TESTIMONY THAT THEY ARE OBLIGATED TO "TELL THE TRUTH," WHICH AMOUNTS TO SELF- AND PROSECUTORIAL-VOUCHING

A common trial scene occurs when a "cooperating" witness is asked questions to elicit the obvious and indisputable point that s/he has an incentive to testify as the government wishes (*i.e.*, to secure a lower sentencing recommendation from the government and thus a lower sentence).  The witness usually parries by claiming his/her only obligation under the plea agreement is to testify truthfully.  The witness often takes this effort a step further, claiming s/he doesn't understand any of the terms of the plea agreement, all s/he knows is that s/he is obligated to testify truthfully.

This testimony amounts to rank vouching.  That is usually exacerbated when it is made clear that under the plea agreement it is the prosecutor who determines whether the cooperator's testimony is truthful, a point that defense counsel is compelled to elicit in response to the "tell the truth" type of testimony.  Thus, the

witness not only vouches for himself, the government vouches for the witness, because the unmistakable message delivered to the jury is that the prosecutor believes the witness's testimony is true – indeed, the prosecutor vouches for the truth of the testimony so strongly that s/he is prepared to reward the witness for it by recommending a sentencing reduction.

The Ninth Circuit addressed these issues in *United States v. Brooks*, 508 F.3d 1205 (9th Cir. 2008), and held this type of testimony is impermissible vouching.  It bears quoting at length from *Brooks*:

> First, Brooks claims there was vouching in the direct examination of cooperating witnesses.  One witness testified that his plea agreement required him "to say the truth about everything I know and make sure everything is the truth because if they find out I'm lying, they will rip up the agreement and I'll end up with 25 to life." Another witness testified that under his plea agreement, any false testimony by him would greatly increase his sentence. A third witness testified that if he "gave truthful testimony against Alfonso Brooks in this case," then he "may receive a downward departure for time off."  Witnesses testified that they were speaking the truth before the jury and were living up to the terms of their plea agreements.
>
> These statements are mild forms of vouching because they suggest that the witness, "who might otherwise seem unreliable, has been compelled by the prosecutor's threats and the government's promises to reveal the bare truth."  *United States v. Wallace*, 848 F.2d 1464, 1474 (9th Cir.1988).  Such references imply that "the prosecutor can verify the witness's testimony and thereby enforce the truthfulness condition of its plea agreement." *Id*.
>
> Second, Brooks claims there was vouching in the redirect examination of the cooperating witness Juan Soriano ("Soriano") concerning Soriano's earlier plea agreement that greatly reduced his sentence. Soriano agreed with the prosecutor's statement that under his plea agreement he had to "give truthful testimony and that [he] could not lie in [his] testimony." . . .  When Soriano was asked about the Brooks trial, he testified that if he gave false testimony, the government "[would] break up my agreement and they [would] end up giving me 25 to life."
>
> It is generally permissible to address an issue on redirect examination that has been raised in cross-examination, *United States. v. Sarkisian*, 197 F.3d 966, 989 (9th Cir.1999), and here, Soriano's credibility had been attacked on cross. Still, this questioning was improper vouching. The testimony left "the implication that the court, as well as law enforcement, can, has, and will monitor the [witness's] truthfulness." *United States v. Ortiz*, 362 F.3d 1274, 1279 (9th Cir.2004). . . . "Whether the witnesses have testified truthfully, of course, is entirely for the jury to determine; it is improper to communicate that a credibility determination has been made by the AUSA, law enforcement agents, or

21

1       the court, or that the government knows whether the witness is being
truthful and stands behind the veracity of the witness's testimony." *Id.*
2       The government candidly concedes that its questioning "may constitute
error." It is vouching.
3

4 *Brooks*, 508 F.3d at 1209-10. The court concluded by holding that while the

5 vouching in that case did not clear the high hurdle required for relief under the plain

6 error standard (which applied because the issue was not raised in the district court),

7 it "pushed hard against those bounds and threatened the integrity of the verdict. It is

8 not a model for future trials." *Id.* at 1212. Accordingly, Mr. Dolan moves to preclude

9 any such questioning or testimony, or its functional equivalent, and the government

10 should be ordered to admonish its witnesses not to offer such testimony.

11       Relatedly, Mr. Dolan moves to preclude the government from introducing any

12 evidence of this sort, most obviously portions of the plea agreements that cover terms

13 related to telling the truth with respect to cooperation. Given the dangers of

14 impermissible vouching, the Ninth Circuit has held that care must be taken when

15 admitting cooperation agreements like the ones in this case. *See United States v.*

16 *Roberts*, 618 F.2d 530, 533-37 (9th Cir. 1980); *see also United States v. Smith*, 962

17 F.2d 923, 933 (9th Cir. 1992); *United States v. Shaw*, 829 F.2d 714, 717 (9th Cir.

18 1987); *United States v. Brown*, 720 F.2d 1059, 1074 (9th Cir. 1983). In *Roberts*, the

19 Ninth Circuit adopted Judge Friendly's comments concurring in *United States v.*

20 *Arroyo-Angulo*, 580 F.2d 1137, 1150 (2d Cir. 1978), that truth-telling and perjury

21 provisions in "cooperation agreement[s] add[] little to the truth-telling obligation

22 imposed by the oath; that the prosecutor often has no way of knowing whether the

23 witness is telling the truth or not; [and] that the books are not filled with perjury

24 indictments of government witnesses . . . ." *Roberts*, 618 F.2d at 536-37. Here,

25 introduction of certain portions of the cooperation agreements, or evidence thereof,

26 would create the misleading impression that the government can, or even will try, to

27 control the witnesses' veracity by voiding the agreements and prosecuting them for

28 perjury if they lied. Accordingly, the Court should preclude any such evidence, or its

ilk, in whatever form.

## SEVER DEFENDANTS FOR TRIAL, OR PRECLUDE EVIDENCE THAT VIOLATES *BRUTON*

As the Court is aware, Mr. Dolan and the other Defendants moved to be tried separately, or at least in smaller groups that limit the potential for prejudice from their joint trial.  Among the reasons given for such a severance, Mr. Dolan raised "the government's introducing evidence of a Defendant's statements to agents at trial, when that Defendant does not testify and thus is not available for cross examination, *see, e.g., Bruton v. United States*, 391 U.S. 123 (1968)."  In its response in opposition, the government acknowledged such issues exist, but stated:

> [1] [T]he United States submits that that the admissibility of portions of particular co-defendant statements is a question best addressed during the motions in limine.  Even so, case law provides a roadmap to how such statements would be admissible.  [2] First, the Confrontation Clause only applies to "testimonial" statements, and statements made by co-conspirators in furtherance of the conspiracy are not testimonial. *United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). [3] Second, among testimonial statements, "only those statements that 'clearly inculpate' the defendant or are 'powerfully incriminating' implicate the 'Bruton' rule." *United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir. 1988) (quoting *Richardson v. Marsh*, 107 S. Ct. 1702, 1709 (1987)). Third, for any such testimonial statements that do implicate *Bruton*, Confrontation Clause problems can be overcome by appropriate redaction and a proper limiting instruction: "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to her existence." *Marsh*, 107 S. Ct. at 1709.  Nothing about this analysis requires severance of any defendant from this case.

2/15/19 Gov't Memo. at 82 (Docket #237) (brackets added).  There are three replies, keyed to the bracketed numbers in the preceding block quote.

First, Mr. Dolan understands that the Court did, in fact, delay ruling on the severance issue as it relates to *Bruton*, and the government's proposed time for doing so has arrived.

Second, Mr. Dolan's motion was directed primarily at "evidence of a Defendant's statements to agents" when being questioned about the facts underlying this case.  Those are not statements made in furtherance of the conspiracies charged.

Third, the government's general claims as to how the Court could admit such statements without prejudicing a Defendant rely on case law decided before *Crawford v. Washington*, 541 U.S. 36, 52 (2004). Because any Defendant's statement to agents is obviously "testimonial" under *Crawford*, any such statement that implicates a co-Defendant must be precluded from a joint trial, or that Defendant must be tried separately. *Id.* ("[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard"). And though it is not clear what the government means when it claims that the Court may nonetheless admit such statements with a "limiting instruction," that is impermissible. *See id.* at 60-68. At any rate, so that the Court and parties may properly address any such issues, and whether they warrant severance or preclusion of evidence, the government should be required to identify any such statements that it intends to use at trial.

With respect to this last point, the government has previously claimed that for the Court to conduct its analysis in this regard Mr. Dolan should first identify any statements that the government might seek to introduce that implicate *Bruton*. Mr. Dolan cannot read the four prosecutors' minds and determine what evidence they might seek to introduce during trial. Moreover, the government does not say how this Court can, in the government's words, "overcome" the *Bruton* issues by ordering "appropriate redaction[s]," without the government first revealing the subject statements to the Court and the defense, and its proposed redactions. Furthermore, the government's silent approach is contrary to Federal Rule of Criminal Procedure 14(b), which indicates that to assess whether severance is warranted "the court may order an attorney for the government to deliver to the court for in camera inspection any defendant's statements that the government intends to use as evidence." Of course, if the government proposes to introduce such statements in a manner that does not offend *Bruton*, *Crawford*, *et cetera*, the statements, and the government's proposals, will also have to be revealed to the Defendants so they may respond to those proposals (*e.g.*, whether the statement is testimonial, whether it can be admitted

24

in a limited manner, whether a limiting instruction is adequate).

Accordingly, Mr. Dolan:  (1) moves that the Court order the government to identify any Defendant's statement made to an agent/investigator (or that are otherwise even arguably testimonial) that inculpate another Defendant and about which it intends to introduce evidence at trial; (2) renews his severance motion, or, more accurately, requests that the Court rule on the outstanding severance motion based on what has been filed previously on this issue and the government notice Mr. Dolan seeks to compel here; (3) moves that if the Court is not going to order severance, that it preclude any statement by a co-Defendant to agents/investigators (or any statement that otherwise implicates *Bruton* and *Crawford*) that inculpates Mr. Dolan in any way; and (4) moves that the Court order that if the government fails to provide pretrial notice of any such statement that it intends to use during trial, and thereby precludes pretrial consideration of that statement with respect to severance and preclusion on *Bruton* grounds, the government will be precluded from introducing evidence about that statement during trial.

## CONCLUSION

For the foregoing reasons, Mr. Dolan requests that the Court grant the motions discussed above.

Respectfully submitted,

Date: August 12, 2021                    */s/ Todd W. Burns*
                                         Counsel for James Dolan

1

## CERTIFICATE OF SERVICE

2        Undersigned counsel certifies that the foregoing pleading is true and accurate

3   to the best of information and belief, and that a copy of the foregoing document has

4   been caused to be delivered this day upon counsel for all parties via CM/ECF.

5

6   Date:  August 12, 2021              */s/ Todd W. Burns*
                                        Burns & Cohan, Attorneys at Law
7                                       1350 Columbia St., Suite 600
                                        San Diego, California, 92101
8                                       Phone:  619-236-0344
                                        Fax:  619-768-0333
9                                       Email: todd@burnsandcohan.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28